Argued January 8, reversed June 24, 1953

RICHARDSON et ux. *v.* MURPHY et al.

259 P. 2d 116

*Sam F. Speerstra* argued the cause for appellants. On the brief were Rhoten, Rhoten & Speerstra, of Salem.

*Loren D. Hicks,* of Salem, argued the cause and filed a brief for respondents.

Before LATOURETTE, Chief Justice, and ROSSMAN, LUSK, TOOZE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs, Ward K. and Vera A. Richardson, husband and wife, from a decree of the circuit court which ordered that "the plaintiffs have nothing and their suit be dismissed". The defendants-respondents are the city of Falls City and Vernon Murphy, mayor of that city. The complaint was based upon charges that a trash dump, operated by the city adjacent to property owned by the plaintiffs, was a nuisance and that it should be abated.

The plaintiffs submit only one assignment of error. It follows:

"The court erred in holding that the placement of a trash and garbage dump in a forested area by the city of Falls City adjacent to appellants' forested lands, with no fire protective measures being taken thereon, failed to constitute a nuisance entitling the appellants herein to injuctive relief."

The answer admits the following averment of the complaint:

"* * * plaintiffs are the owners of approximately 930 acres of land * * * and said land is a reforested area and is covered with young timber approximately thirty years old, and that the area surrounding plaintiffs' said lands is also a reforested area covered with timber approximately thirty years old."

The answer of the defendants admitted that the city was the owner of the northeast quarter of the northeast quarter of section 30, which was a tract adjoining the plaintiffs'.

The properties of the plaintiff and of the city are in a region which is covered with a dense growth of timber. The plaintiff, Ward Richardson, in describing

his land, the city's and the surrounding area, spoke in this vein:

"This is all forest land or timberland, as it is classified by the Forest Department; it is either in growing timber or land that has been cut over and is reforested, and it is altogether of that kind of land. There is no farm land, except garden."

The original stand of timber was cut, so he said, "in the early 1890's" and before long a new growth appeared. He estimated that the average age of the trees in the area was 35 years. The area abounds in "a great deal of underbrush and fern and growth of all kinds," according to unchallenged evidence. `

The properties of the plaintiffs and of the city lie about one and one half miles from the nearest boundary line of the city of Falls City. Since 1930 the plaintiffs have maintained their home upon their property and, according to Mr. Richardson, "Our main objective there is to raise trees." In the year preceding the trial the plaintiffs sold 1,000 poles produced on their land.

The tract owned by Falls City is also covered by second-growth timber. In April, 1950, the city installed upon its tract a trash dump. The latter is located about 700 feet from the plaintiffs' line and 2200 feet from their home. The site is 900 feet from the highway. A road built by the city runs from the latter to the dump, which is a simple affair. After the timber had been removed, power machinery leveled an area of ground no more than 100 feet in its maximum dimensions and in its center excavated a pit 60 feet or so in diameter. Since the site, like all of the adjacent area, is hilly, one of the banks of the pit is possibly seven or eight feet high, but the other is level with the grade. Young firs with branches that almost touch the ground grow to the perimeter of the cleared area, but between the per-

imeter and the pit a few feet of barren land lies. The total cost of the land, excavation and construction of the access road was $800. The city has no other place to deposit refuse and rubbish. The evidence indicates that other sites for dumps are obtainable which would present less fire hazard to the surrounding forest, but identifies the location of only one of them. Seemingly, the city found that site unacceptable. Although the mayor and one other city official testified, neither of them made any intimation that no other site was available.

Mr. J. W. Martin, the city's street commissioner, answered in the affirmative a question which asked: "Do you look after the cleaning up of the garbage, etc., that is hauled away from the city?" He testified that he personally performed that work and used a truck in so doing. We quote further from his testimony:

"Q   Do you have a regular time that you pick up the garbage and what not?

"A   I make two regular clean-ups, one in the spring, and one in the fall, and otherwise about twice a week to business places and on calls.

\* \* \*

"Q   Where do you take these materials, Mr. Martin?

"A   To the city dump."

After giving the foregoing testimony, Mr. Martin swore that he neither accepted nor hauled garbage. It will be observed that he stated that he was available "on calls" and explained that whenever a householder or a place of business telephoned for him he removed the refuse which the person had accumulated by taking it to the dump. He swore that he placed in the dump no boxes, paper or other inflammable material, and likewise said that he deposited no garbage in it. The defendant, Mr.

Vernon Murphy, mayor of the city, after testifying that Mr. Martin had sole charge of the dump, declared that instructions had been given that no inflammable material should be cast into it, "just tin cans and bottles and fenders off cars and things of that kind." The ordinance of the city under which the dump was installed and which governs its operation says:

"Section 1. That the City of Falls City shall establish a trash dump for the disposal of nondecomposing trash or refuse.

"Section 2. Only refuse and rubbish which will not decompose may be placed in this dump.

"Section 3. The operation of this dump will be the responsibility and under the supervision of the Street Committee.

"Section 4. No dumping will be allowed without permission of the Street Committee."

It will be observed that the ordinance employs the term "nondecomposing" but omits "nonflammable". Under the provisions of that ordinance Mr. Martin administered the dump.

A locked chain has been strung across the road which leads from the highway to the pit for the purpose of barring all to whom Mr. Martin has granted no leave. It appears, however, that unauthorized persons have hauled material to the dump. The latter has contained, so witnesses swore, a variety of refuse including cans, bottles, sacks, paper, an automobile seat, discarded tires and paper cartons. Articles of clothing were mentioned by some witnesses as were also items of oily waste. An official of the State Board of Forestry saw in the pit material which he described as "a bunch of excelsior, hair matting, probably padding". The quantity was large. Another witness who saw the material gave a similar description of it. Some wit-

nesses claimed that they saw garbage in the place. Mr. Martin, referring to the day before the trial, testified that he saw in the pit straw, boxes, a door, greasy rags, greasy paper and other litter. He protested that he did not put it there. Although he expressed the belief that the pit would not constitute a fire hazard if no one except himself deposited material in it, he admitted that the material he saw there the day before the trial was inflammable and could readily create a blaze capable of spreading. The defendants intimate that the inflammable articles which Mr. Martin saw a week before the trial may have been surreptitiously taken to the dump. However, the record indicates that items of like kind have been found in it upon more than one occasion.

The city maintains no watchman for the dump and has not safeguarded the latter by the construction of fire trails. At the end of the first year of operation and before the fire season started, Mr. Martin poured oil upon the accumulated refuse and then burned it. At the close of the second year of operation the dry season had begun before Mr. Martin had an opportunity to burn the contents and he thereupon covered virtually all of it with dirt. No fire except the one lighted by Mr. Martin has ever burned in the place. Falls City has a volunteer fire department and possesses an item of fire fighting equipment which Mr. Martin termed "a water truck". According to him, the truck is equipped with a pump, hose and a tank which holds 400 gallons of water. He claimed that this equipment could reach the area within eighteen minutes. The above mentions all the safeguards taken by the defendants.

In addition to the road built by the city which leads to the dump and which is barred by the locked chain, one or two roads, which are not commonly known, give

access to it. Witnesses testified that since access to the dump is difficult, many people, under cover of night, throw garbage to the side of the road in the general vicinity of the dump and that the trash, including paper, boxes and cartons, thus deposited upon the forest floor increases the fire hazard.

Mr. Richardson, when asked whether the dump constituted a fire hazard, replied, "Yes, very definitely it does." According to him, it endangers the entire area and a fire originating in it, if aided by a favorable breeze, would quickly spread to thousands of acres of forest. He swore that the presence of the dump, which he deemed a fire hazard, depreciated materially the value of the plaintiffs' property, and added that in the event they wished to sell it they "would take quite a heavy sacrifice." Both he and his wife testified that odors and numerous flies came from the dump to their property. The two, and their daughter, dwelled upon the grave anxiety which they experienced over the possibility that a fire would originate in the dump and the many times each week during the fire season that their fears drove them to it.

Mr. J. W. Lacey, a resident of Falls City who had visited the dump many times, testified: "There was plenty to make a fire." According to him, he was so fearful of the hazard to the town and its adjacent timber that he prepared a petition addressed to the city council which remonstrated against the dump. One hundred people signed the papers. His testimony was unchallenged. The population of Falls City, according to the last national census, is 853.

Mr. Ray Lowry, of Falls City, who is a logger, passed the dump while pursuing his work. He described the contents of the pit as "just like any other city

dump'', and mentioned specifically bottles, cans, paper, boxes and automobile tires. He believed that the material was inflammable. If a fire started in the pit it could readily extend to the plaintiffs' property, so Mr. Lowry believed. Since he had not had experience with dumps, he felt incapable of determining whether this one was a fire hazard.

Mr. Oscar Eckstein, the owner of property which borders in part upon the area in which the dump is located, swore that, due to his fears that a fire might break out in the pit, he visited it frequently during the dry season. He saw inflammable material in it, and added:

> "I think, due to the opposition the dump has had, there is less there than there would have been, but there is enough there to go on."

Presently he explained:

> "Well, to my mind, you don't need a whole mountain of rubbish to start a fire. A place like that, the way a person will discard a box of book matches and a label off a can, and a little wind to blow it 20 or 30 feet into the dry forest, to my mind you have got a fire. I don't think you need a mountain of it."

Mr. W. M. Curtis, district warden of the State Board of Forestry, in charge of fire protection and fire suppression, had visited the dump seven or eight times before entering the witness stand. "I seen material there,'' so he swore, "that was definitely a fire hazard." In the "surrounding terrain,'' he found "heavy undergrowth" and dry slashings. He epitomized the situation thus: "It looked to me like a terrible place to put a dump." Then he said: "We had a lot of dumps that were too close to a forested area, that has caused fires and caused great expense and considerable work

to control." In the words which follow he accounted for the origin of fires in dumps:

"Well, a number of different ways they can start. There could be an accumulation of debris, grass, paper, oily rags, some boys may hike through, quite often they drink and brawl around in there, and maybe they drop a match, or maybe somebody is careless and ashes are dumped in."

The drivers who bring refuse to the dump may themselves cause a fire, so he said. Again we quote from him:

"It is possible to have a major fire from that [the dump]. * * * In my opinion they could not have picked a worse place from the standpoint of fire. * * * Well, yes, there is a threat there of fire, always will be as long as there is a dump established in a forested area like that. Heavy reproduction. That old slash was never burned. Duff on the ground."

Mr. Curtis testified that he visited the dump in 1951 with the mayor of Falls City and that on a previous occasion he had participated in a meeting of the city council which was concerned with the dump. At the conclusion of his visit to the dump with the mayor he made recommendations for safety measures which he summarized in the following testimony:

"I told him that they could clear off, fall all timber and brush, clear it off for 50 feet around the outside of the dump and then go back another 100 feet and put a bulldozed fire trail down to mineral soil."

His recommendations were not adopted. Upon cross-examination he declared:

"I don't see how they could have picked a worse place for a dump, in a forested area like that. Why they should pick a dump there is more than I could understand, * * *."

It developed upon further cross-examination that, pursuant to a request of the State Forester, he had made an investigation of the dump and had reported his findings in a written communication addressed to his superior in which, according to the testimony, he said:

"It was a hazard and would be as long as there was a dump there; that I thought it should never have been put there in the first place."

The witness mentioned several dumps maintained by cities of approximately the size of Falls City in which fires had originated. He believed that the hazards resulting from dumps become worse as time goes on. Vigilance, according to him, relaxes before long when no fire breaks out.

Mr. Mars Slack, an inspector for the State Board of Forestry, charged with the enforcement of fire laws pertaining to operations in the forests, visited the Falls City dump twice in the spring of 1950. He believed that its location was "definitely not" a suitable one.

Mr. Lee Port, district supervisor for the State Board of Forestry, examined the dump a week prior to the trial and found in it "some old boxes, an old inner tube, and what looked like an old rubber boat, an old car cushion, a few things like that, and some papers."

He expressed the belief:

"I think the dump is a hazard, yes. There was some oily waste at that time, which I think could start a fire. * * * I think everyone in that area is in danger from that particular dump if it ever catches on fire."

Mr. Vernon Murphy, mayor of the city, testified that he had seen nothing in the pit which indicated that the latter was a fire hazard. However, immediately after so saying he made the following statement:

"I was there once, right after it was burned, and

then I had usually been there in more winter weather when I was not working."

As appears from incidents which we have already mentioned, the fire which Mr. Martin set destroyed the contents of the pit. Mr. Murphy was employed at Valsetz, some distance from Falls City, and did not have time to visit the pit in the summer months. His testimony, therefore, was not concerned with any time that was pertinent.

It will be observed that the plaintiffs, their daughter and a neighbor manifested anxiety during the dry season over the possibility that a fire would start in the dump, destroy their homes and sweep over the adjacent areas. The Forestry officials whom we have mentioned expressed beliefs that the fears were warranted. For example, Mr. Curtis, referring to Mr. Richardson, testified:

"I think he has good grounds there of thinking that a fire could, if conditions were right, do great damage there, not only to his property but to the adjoining property.

"Q  As I understand it, the danger there is recognized by your office and you are constantly aware that there is a fire danger there. Is that right?

"A  That's right."

We take the following from Mr. Slack's testimony:

"Q  This danger is not imaginary, you think?

"A  Definitely it is not imaginary."

Some of the witnesses were of the opinion that material in the pit, more particularly oily waste, could take fire on a warm, dry day through spontaneous combustion. Opinions were ventured that a bottle in the pit could converge the rays of the sun sufficiently to start a fire if paper was nearby. Thus, the bottle would operate as a burning glass.

Although the three Forestry men disapproved the aforementioned location as a proper place for the city's dump, they offered little criticism of the manner in which the dump was operated. They believed, however, that the locked chain which barred the public from the dump caused people to throw their refuse into adjacent areas and thereby litter the forest floor with inflammable material.

A conclusion is warranted that the plaintiffs and others remonstrated against the construction of the dump before work upon it was begun and that objections against its operation have been offered since then. We have mentioned the remonstrance bearing 100 signatures which Mr. Lacey presented to the city council, and that Mr. Curtis, in addition to meeting with the council, accompanied the mayor to the dump. Upon both occasions Mr. Curtis voiced objections to the operation of the dump. We take the following from his examination:

"Q Did you ever take any steps to get the city to stop using the dump?
"A Well, when I heard about it, I talked muchly against it."

The above completes our review of the evidence. It will be observed that this is not an instance in which an injunction is sought against the installation of a trash dump, but is one in which relief is asked against a dump which has been built and which had been in operation for almost two years when the trial was begun. We think it is clear that, notwithstanding the city's efforts to bar intruders from the dump, inflammable material in substantial amounts has been cast into the pit upon many occasions. As we have seen, the branches of young firs droop down to the ground at the edge of the clear-

ing and constitute a ready means for picking up fire from a blaze originating in the pit, if one ever should start there, and of carrying it into the forest. Unless we misinterpret their position, the defendants do not claim that a fire which originated in the trash would not spread into the timber, but believe that the evidence does not show that a fire is likely to develop there. We shall now take note of the exact contentions of the parties and will then turn to the authorities.

The plaintiffs' brief, referring to the plaintiffs themselves, says:

"They base their claim to relief upon two separate grounds, either or both of which are sufficient to entitle them to relief: (1) the condition created by the respondents is a statutory public nuisance which the appellants, being particularly affected thereby, are entitled to abate; and (2) the condition created by the respondents constitutes a nuisance at common law entitling the appellants to relief."

The defendants-respondents' brief states in the following vein what it deems the crucial issue:

"The question upon which this suit finally must turn is whether or not a fire is likely to be created in the dump itself. Appellants and their witnesses describe damage that might be done should a fire escape from the dump, but they were presupposing. that a fire would start therein that could escape. It first must be established that a fire is likely, sure or certain to occur in the dump. Such was not proved and is not a fact. The possibility, therefore, of fire escaping from the dump and doing damage is unimportant and unnecessary of investigation."

Before going on, we pause to observe that if a court, which was asked to protect the state's greatest natural resource—its forests—from a fire which threatened to

occur, had to wait until it was "established" that a fire was "likely, sure or certain" to break out, its injunction, in all likelihood, would come too late.

■ We quote the following from 66 CJS, Nuisances, § 19, p 768:

"While it has been held that a mere tendency to injure is not sufficient to render a use of property a nuisance, it has also been held that a nuisance may arise from the creation or maintenance of a condition having a natural tendency to cause danger and inflict injury, or from the use of an intrinsically dangerous agency, the necessary and obvious effect of which is to cause harm. However, not every dangerous agency is a nuisance; and an instrumentality maintained on private premises may only be said to be a nuisance on the ground that it is calculated to produce personal injuries when it is of such character, and so maintained, that it is reasonably and naturally calculated to injure the general public or strangers who may come on the premises. While it has been held that the courts will not give cognizance to apprehended fears arising from the conduct of a lawful enterprise, substantial fear or reasonable apprehension of danger which interferes with the comfortable enjoyment of life and property may constitute a nuisance causing such injury as against which relief may be had. The question is, not whether the fear is 'founded in science,' but whether it exists; not whether it is imaginary, but whether it is real; real, that is, in the sense that it affects the movements and conduct of men. If no real danger exists the mere fact that uninformed people who are unacquainted with the true conditions may or probably will assume danger to exist cannot be made the basis of equitable relief. It has been held that, where defendant's acts or conduct do not necessarily cause damage to others, the mere existence of danger does not create liability for a nuisance unless circumstances charge defendant with notice of the danger."

Examples showing the application of the principle stated in the quoted language are *Esson v. Wattier,* 25 Or 7, 34 P 756, and *Phipps v. Rogue River Valley Canal Co.,* 80 Or 175, 156 P 794. In the latter, the plaintiffs, as owners of a tract of land which the defendant proposed to cross with an irrigation ditch, sought an injunction against the venture. The defendant planned to take water from a creek which had virtually no flow in the dry season and into which the sewers of four municipalities emptied. The evidence indicated that the polluted water had an offensive odor and that the stench from stagnant pools which remained in the creek bed in the summer months rendered occupancy of the plaintiffs' property unpleasant. When the defendant proposed to condemn a right of way across the plaintiffs' property for the irrigation ditch, preparatory to constructing the latter, the plaintiffs instituted the suit under review. This court, in authorizing an injunction unless the defendant conducted the water in pipes across the plaintiffs' property and filed an indemnity bond, adopted the following from Joyce, Nuisances, § 19:

> " 'It is difficult to define just what degree of injurious influence must be reached in order to warrant the court in determining what circumstances constitute a nuisance. A mere tending to injury is not sufficient; there must be something actually appreciable, which of itself arrests the attention, that rests not merely in theory, but strikes the common sense of the ordinary citizen. The determination, however, of the question rests in sound judgment and depends upon common sense in each case. * * * If property cannot be enjoyed unless the health is endangered thereby, a nuisance exists. It is not necessary, however, in order to constitute a nuisance, that the annoyance should be of such a character as to endanger the health of a person or persons, or of the neighborhood, the act need not

be postively unhealthy. It is sufficient if it occasions that which is offensive to the senses, and that in any way renders the enjoyment of life and property uncomfortable, or that it prevents its enjoyment in as full and ample a manner as before, that it invades or violates a vested right and materially interferes with the ordinary comfort of human existence or renders one's dwelling-house unfit for habitation; and if the enjoyment of life and property has been so rendered uncomfortable, it is not indispensable to sustain a right of action that one should, by the annoyance or alleged nuisance, have been driven from his dwelling or habitation. So even that which causes a well-founded, reasonable apprehension of damage may be a nuisance.' ''

In applying the principles of which we have just taken notice and in determining whether or not the plaintiffs have shown with the required degree of certainty that a fire may originate in the dump and spread to their property, we shall now give heed to §§ 107-208 and 107-241, OCLA. The first of those statutory provisions says:

"Any and all inadequately protected forest land covered wholly or in part by inflammable debris or otherwise likely to further the spread of fire, which by reason of its situation or condition or lack of protection endangers life or property, is hereby declared to be a public nuisance, * * *."

Section 107-241 reads as follows:

"Every owner of timber land in the state of Oregon shall furnish or provide therefor, during the season of the year when there is danger of forest fires, adequate protection against the starting or spread of fire thereon or therefrom which shall meet with the approval of the state board of forestry."

Section 107-208, in addition to condemning as "a public nuisance" inadequately protected forest land, author-

izes the state forester to have done, at the expense of the owner, all work which is necessary to render safe a parcel of inadequately protected forest land if the owner, after receiving notice from the forester, permits ten days to pass and fails to perform the work himself. The provision says that the forester may in such instances act "summarily, without the necessity of court action."

According to our belief, the evidence shows that the city's tract of land is not properly protected. We are persuaded particularly by Mr. Curtis' testimony in which he described his trip to the tract in company with the mayor and, later, at a meeting of the city council, recommended to it measures for lessening the dangers of fire in the dump.

We see from the two statutory provisions just quoted that our legislature deems that the presence of inflammable debris upon forest land, for which adequate protection has not been provided, renders the land "a public nuisance". In fact, the legislature evidently felt that the probability that fire might develop upon such land was so manifest that it provided the method of which we have taken notice whereby the State Forester can summarily procure protection for the land. Not only do the statutes which we have just reviewed warrant a belief that the inflammable trash which is cast into the pit from time to time will probably create a fire, but evidence given by the witnesses strongly supports the same view. For example, Mr. Curtis, who evidently had no purpose except to develop the facts, clearly indicated that the dump is a perilous tinderbox in a forest.

Without resort to further analysis of the record, we express our conviction that the dump affords a reasonable ground for believing that a fire may break out

in it. We do not think that the testimony shows merely a possibility of fire, but that it goes beyond that and establishes a probability and a constant threat of fire.

We take the following from Restatement of the Law, Torts, § 831:

"Under the rules stated in §§ 826-828, an intentional invasion of another's interest in the use and enjoyment of land is unreasonable and the actor is liable when

(a) the harm is substantial; and
(b) the particular use or enjoyment interfered with is well suited to the character of the locality; and
(c) the actor's conduct is unsuited to the character of that locality."

■ According to our view of the facts, all three of those elements are established by the evidence.

The defendants' brief, with commendable frankness, states:

"It is well settled in our American jurisprudence that a private individual may maintain a suit to abate a public nuisance if it is also a private nuisance to him."

The evidence satisfies us, for the reasons which we have developed, that the trash dump is not only a public nuisance, but also a private one to the plaintiffs. For example, their property declined in value after the dump was installed.

In view of the fact that we deem the pit a nuisance, the plaintiffs are entitled to a decree. The defendants' brief indicates that safeguards can be installed and that safety measures can be inaugurated at the dump which will eliminate the hazards revealed by the evidence. It will also be recalled that Mr. Curtis deline-

ated preventive measures which he thought would provide safety for the pit. In vacating the decree of the circuit court, we remand the cause with instructions to that court to enter a decree abating the trash dump if the defendants refuse to take measures which will safeguard it. The safeguards should contemplate nothing less than the protection exacted by statutes such as § 107-208, OCLA. If the defendants elect to render the property safe, the court shall enter the necessary provisions in its decree.

Reversed.